UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| FEDERAL RESERVE BANK<br>Of ST. LOUIS,<br><br>    Plaintiff,<br><br>v.<br><br>PLANVIEW DELAWARE LLC,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)   Case No.<br>)<br>)   JURY TRIAL DEMANDED<br>)<br>) |

## COMPLAINT

Plaintiff Federal Reserve Bank of St. Louis for its Complaint against Defendant Planview Delaware LLC, states as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff Federal Reserve Bank of St. Louis (the "Bank"), is an instrumentality of the federal government and is a private, federally chartered nonprofit corporation established under the Federal Reserve Act of 1913, 12 U.S.C § 221 *et seq.*, with its principal place of business at One Federal Reserve Bank Plaza, St. Louis, Missouri, 63102.

2. Defendant Planview Delaware LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1301 Research Blvd., Research Park Place V, Suite 101, Austin, Texas, 78759.

3. This Court has jurisdiction over this matter pursuant to the Federal Reserve Act, 12 U.S.C. § 632 and 28 U.S.C. § 1331 in that the district courts of the United States have original jurisdiction in any civil action in which a Federal Reserve Bank is a party.

4. Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. 1391(b)(2) as a substantial part of the events or omissions giving

1

rise to the claim occurred in this district and pursuant to Section 12.8 of the parties' SaaS Master Agreement.

## FACTUAL BACKGROUND

### *The Agreement*

5.  After a public bidding process, the Bank and Defendant entered into a SaaS Master Agreement on March 9, 2018 (the "Agreement"), whereby Defendant, among other things, agreed to provide an online real-time web-based business application, referred to as Planview Enterprise One, with associated software and documentation (collectively referred to as "SaaS Services") and associated consulting services ("Consulting Services"). A true and accurate copy of the Agreement is attached hereto and filed under seal as Exhibit 1.

6.  The Agreement describes the Consulting Services that Defendant shall provide to support the Project.

7.  The Agreement defines "the Project" as "the analytics and capabilities to be delivered under [the Agreement], and will be configured by the Consulting Services to enable Bank's expected outcomes."

8.  The scope of the Project was specifically defined by the Bank's expected outcomes which were set forth in the Agreement:

> A. "Deliver a foundational and collaborative platform to manage the project portfolio;"
>
> B. "Be able to eliminate redundant or unnecessary projects in order to ensure [the Bank's] resources are working on the right things;"
>
> C. "Understand how much [the Bank] is spending on project vs. non-project work;"

D. "Support an effective annual planning process; effectively plan [the Bank's] resources teams in advance;"

E. "Have real time visibility into project status and resource utilization, reducing overhead in collecting and maintaining that information;"

F. "Ensure communication between IT and the business to reevaluate the portfolio in response to new demand;"

G. "Ensure [the Bank] commit[s] to the right projects; deploying a standardized project and work intake process to support the prioritization and assessment of new demand;"

H. "Provide visibility into project costs and variance against budgets in order to improve estimations and accuracy;"

I. "Identify where resources are overcommitted or underutilized;" and

J. "Ensure that there is an up-to-date view on the current state of in-flight projects to facilitate the trade-off decisions."

### *Deficiencies in the SaaS Services and Consulting Services*

9. Shortly after March 9, 2018, pursuant to the Agreement, Defendant commenced its attempted performance and delivery of the SaaS Services and Consulting Services.

10. By the end of April 2018, Bank discovered material deficiencies in the SaaS Services and Consulting Services. Bank raised its concerns regarding these deficiencies with Defendant. In response, representatives of Defendant indicated that it could not meet the Bank's expectations as outlined in the Agreement.

3

11. On May 9, 2018, the Bank gave written notice to Defendant that the Saas Services and Consulting Services were unacceptable and did not comply with the requirements of the Agreement. Specifically, the Bank's notice informed Defendant of the following problems:

A. "The configured SaaS Services do not support Bank's ability to have real time visibility into project status and resource utilization, reducing overhead in collecting and maintaining that information; but instead, as designed and configured, the SaaS Services only provide project status and resource utilization information with a one week lag;"

B. "The configured SaaS Services do not provide an up-to-date view on the current state of in-flight projects to facilitate the trade-off decisions; but instead, as designed and configured, the SaaS Services report actual effort only weekly, so [the Bank] does not have the ability to report or view actual effort on a real time basis;"

C. "The configured SaaS Services do not provide visibility into project costs and variance against budgets in order to improve estimations and accuracy; but instead, as the SaaS Services are designed and configured, scheduled start/end dates disappear when actual work starts, requiring a cumbersome workaround process of creating frequent manual project deadlines;"

D. "The configured SaaS Services do not support [the Bank's] ability to identify where resources are overcommitted or underutilized as the "My Scheduled Assignments" tile is not usable for team members and cannot be corrected without an additional Statement of Work,[1] additional expense for [the Bank], and failure to meet the agreed go-live timeframe;" and

---

[1] Capitalized terms not otherwise defined in this Complaint shall have the meaning ascribed to them in the Agreement.

4

  E. "…out of the box reporting does not support the above requirements, and custom reporting is not available without additional expense for [the Bank]."

### *Defendant Cannot Cure Deficiencies*

12. Pursuant to paragraph 10.4 of the Agreement, Defendant had sixty (60) days to cure the deficiencies noted in the Bank's May 9 correspondence.

13. However, in the discussions between the Bank and Defendant to resolve these issues, representatives of Defendant admitted that certain of these deficiencies could never be solved and the Bank's requirements as set forth in the Agreement cannot ever be met.

14. In these prior discussions, representatives of Defendant also admitted to the Bank that certain other deficiencies of the SaaS Services could possibly be corrected in the future but would not be done in time for the agreed go-live date of the Bank's implementation of the SaaS Services.

15. Because representatives of Defendant had already informed the Bank that it was unwilling or unable to correct the noted deficiencies as set forth in the May 9 correspondence, the Bank deemed the Defendant to be in anticipatory breach of the Agreement and therefore informed Defendant that it was exercising its rights to terminate the Agreement pursuant to paragraph 10.4.

16. In that correspondence, the Bank made demand for a refund in the amount of $120,778.00 for the fees it paid for the SaaS Setup Fee(s), SaaS Service fees, including fees for User subscriptions which were never used by the Bank, as well as fees paid for Consulting Services.

17. On May 17, 2018, Defendant responded by stating that it had performed the requirements of the Agreement but to the extent that corrective action is still necessary it would take such steps and requested a meeting to resolve the issues.

18. Per Defendant's request, the Bank and Defendant had a conference call on May 31, 2018 to attempt to resolve the deficiencies of the SaaS Services failing to meet the Bank's requirements as set forth in the Agreement.

19. In that conference call, representatives of Defendant were unable to provide solutions to meet the Bank's requirements.  Rather, Defendant's representatives pressed the Bank to accept cumbersome workarounds that would require a significant overhaul of the Bank's processes to use the SaaS Services as currently configured.

### *Termination of the Agreement*

20. On June 13, 2018, the Bank again informed Defendant that the deficiencies noted in the May 9 correspondence remained outstanding and the Bank was terminating the Agreement.

21. In that correspondence, the Bank again made a demand for a refund in the amount of $120,778.00 for the fees it paid for the SaaS Setup Fee(s), SaaS Service fees, including fees for User subscriptions which were never used by the Bank, as well as fees paid for Consulting Services.

22. On June 25, 2018, Defendant notified the Bank that it refused to recognize the Bank's termination of the Agreement.  Instead of providing solutions to cure the deficiencies, Defendant again urged the Bank to "adapt to the new product as soon as possible . . . This shift requires the Bank to adjust its process and practice."

23. The deficiencies noted in the May 9 correspondence remain uncured by Defendant and more than 60 days have passed since Defendant received the notice of termination.

24. To date, Defendant has not refunded the Bank's fees and, in fact, has billed the Bank for additional fees.

## **COUNT I: BREACH OF CONTRACT**

25. The Bank incorporates paragraphs 1 through 24 of this Complaint as if fully set forth herein.

26. Defendant executed and agreed to be bound by the terms of the Agreement.

27. The Bank has performed all of its obligations under the Agreement.

28. Defendant is in material breach of the Agreement because it has failed to cure the deficiencies as noted in the Bank's May 9 correspondence and as a result, neither the SaaS Services nor the Consulting Services met the requirements of the Agreement.

29. As such, the Bank was entitled, under paragraph 10.4 of the Agreement, to terminate the Agreement.

30. The Bank has been damaged and is entitled to a refund in the amount of $120,778.00 for the fees it paid for the Setup, SaaS Service Fees, including fees for User subscriptions which were never used by the Bank, as well as fees paid for Consulting Services.

31. Per paragraph 12.7 of the Agreement, the Bank is also entitled to recover its reasonable attorneys' fees and costs incurred in enforcing its contractual rights.

32. Plaintiff hereby demands a trial by jury.

WHEREFORE, the Bank prays that the Court grant the following relief:

- A. An order granting Bank its Damages caused by Defendant's breach of the Agreement, including prejudgment and post-judgment interest, and consequential damages;
- B. An Order granting Bank its attorneys' fees and costs associated with prosecuting this action in accordance with paragraph 12.7 of the Agreement; and
- C. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

**BLITZ, BARDGETT & DEUTSCH, L.C.**

By: /s/ Kelley F. Farrell
     Kelley F. Farrell, #43027MO
     Aaron W. Sanders, #64133MO
     120 S. Central Ave., Ste. 1500
     St. Louis, MO  63105
     (314) 863-1500
     (314) 863-1877 (facsimile)
     kfarrell@bbdlc.com
     asanders@bbdlc.com

     *Attorneys for Plaintiff Federal Reserve Bank of St. Louis*